IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24-CR-00017 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| ZUBAIR AL ZUBAIR, ET AL., | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, David M.

Toepfer, United States Attorney, and Matthew W. Shepherd and Joseph H. Walsh, Assistant

United States Attorneys, and hereby files this sentencing memorandum.  For the reasons set forth

below, the United States requests this Honorable Court impose sentences of imprisonment within

the applicable guidelines ranges of 210 to 262 months for Zubair Al Zubair and Muzzammil Al

Zubair, and at the low end of the applicable guidelines range at 97 months for Michael Leon

Smedley.  In addition, the United States requests that the Court order Zubair and Muzzammil Al

Zubair to pay full restitution.

I.      **INTRODUCTION**

Defendants Zubair Al Zubair and Muzzammil Al Zubair engaged in a pattern of fraud

and deceit involving multiple schemes and multiple victims over an extended period of time.  As

the evidence at trial showed, they used their lies and schemes to obtain millions of dollars from

victims that they spent on a lavish lifestyle of luxury automobiles, designer clothes, expensive

dinners, first-class travel all over the world, and an arsenal of firearms.  In addition to their fraud

and deceit, they engaged in a corrupt bribery scheme to advance their interests with Michael

Smedley, the East Cleveland Chief of Staff, who received and solicited thousands of dollars in

current and future benefits in exchange for performing and attempting to perform official action

on the Al Zubairs' behalf.  This betrayal of the trust of victims and the community of East Cleveland calls for a substantial sentence for these defendants who have shown no remorse and have taken no responsibility for their actions and the harm they have caused.

## II.    PROCEDURAL HISTORY

After an extensive investigation by the FBI and the IRS, Zubair Al Zubair, Muzzammil Al Zubair, and Michael Leon Smedley were charged in a 32-count superseding indictment.  The Al Zubairs were charged with Conspiracy to Commit Wire Fraud (Count 1), Wire Fraud (Counts 2-15), Conspiracy to Commit Money Laundering (Count 16), Money Laundering (Counts 17-20), Theft of Government Funds (Count 21), Harboring a Fugitive (Count 22, Zubair Al Zubair only), Preparation of a False Tax Return (Count 23, Zubair Al Zubair only), Preparation of a False Tax Return (Count 24, Muzzammil Al Zubair only), Willful Failure to File a Tax Return (Count 25, Zubair Al Zubair only), Conspiracy to Commit Bribery in Programs Receiving Federal Funds (Count 26), Federal Program Bribery (Counts 28 and 30), Conspiracy to Commit Honest Services Wire Fraud (Count 31), and Conspiracy to Commit Hobbs Act Extortion Under Color of Official Right (Count 32).  Smedley was charged with Conspiracy to Commit Bribery in Programs Receiving Federal Funds (Count 26), Federal Program Bribery (Counts 27 and 29), Conspiracy to Commit Honest Services Wire Fraud (Count 31), and Conspiracy to Commit Hobbs Act Extortion Under Color of Official Right (Count 32).  (R. 52: Superseding Indictment, PageID 152-220).

At trial, the government presented the testimony of 35 witnesses, including law enforcement agents who testified regarding the investigation and evidence, and civilian witnesses who testified about Defendants' multiple schemes.  In addition to witness testimony, 324 exhibits were admitted in evidence, including financial records, emails, text messages, business

2

records, photographs, surveillance video, audio recordings, and summary charts. The evidence proved that the Al Zubairs engaged in multiple fraudulent schemes, including investment fraud, fraud related to a cryptocurrency mining venture and equipment, fraudulent efforts to obtain a commercial and residential lease, and fraudulently obtaining money from the Small Business Administration. The evidence showed that they obtained millions of dollars from these schemes and used the money to fund their lavish lifestyle. The evidence also proved that the Al Zubairs engaged in a money laundering conspiracy and multiple acts of money laundering in their many financial transactions. Finally, the evidence proved that the Al Zubairs provided and offered bribes to Smedley, who accepted and solicited benefits from the Al Zubairs, all in an exchange for providing official actions to the Al Zubairs.

After considering the mountain of evidence presented at trial by the government, the jury found the Al Zubairs guilty of all counts, except Zubair Al Zubair was acquitted of Count 22, charging him with harboring a fugitive, and Muzzammil Al Zubair was acquitted of Count 13, a substantive wire fraud charge. Smedley was convicted of all counts against him. (R. 240: Jury Verdicts, PageID 3835-95).

III. **PRESENTENCE INVESTIGATION REPORTS**

The United States Probation Office prepared thorough and detailed Presentence Investigation Reports ("PSR") for all three Defendants. The PSR's provide detailed descriptions of the offense conduct facts and circumstances applicable to each defendant that the Court should adopt in full. *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing the court … may accept any undisputed portion of the presentence report as a finding of fact."); *United States v. Kennedy*, 595 F.App'x. 584, 587 (6th Cir. 2015) ("When the facts in a PSR are undisputed, we repeatedly have held that the district court may rely on those undisputed facts and does not need to find those facts independently.").

In addition to a detailed factual summary, the PSR's calculate the advisory sentencing guidelines ranges for each defendant.  With the exception of the two-level enhancement for possessing a firearm in connection with the offense at U.S.S.G. § 2B1.1(b)(16)(B) applied to the Al Zubairs, the Court should adopt the findings and calculations of the applicable offense level and advisory sentencing guidelines range for each defendant.

A.  **<u>GUIDELINES CALCULATION FOR ZUBAIR AL ZUBAIR IN PSR</u>**

The PSR prepared for Zubair Al Zubair ("Zubair PSR") provides a total offense level of 39.  The convictions for wire fraud conspiracy (Count 1), substantive wire fraud (Counts 2-15), money laundering conspiracy (Count 16), substantive money laundering (Counts 17-20), and theft of government funds (Count 21) group together for guidelines purposes pursuant to U.S.S.G. § 3D1.2(d).  *See* Zubair PSR, ¶¶-57 55.  The convictions for conspiracy to commit bribery concerning programs receiving federal funds (Count 26), substantive federal program bribery (Counts 28 and 30), conspiracy to commit hones services wire fraud (Count 31), and conspiracy to commit Hobbs Act extortion (Count 32) form a second group pursuant to U.S.S.G. § 3D1.2(d).  *See* Zubair PSR, ¶ 69.  Finally, Zubair Al Zubair's convictions for preparation of a false tax return (Count 23) and willful failure to file a tax return (Count 25) are a third group pursuant to U.S.S.G. § 3D1.2(b).  *See* Zubair PSR, ¶ 78.  The PSR calculates the offense level for each group and then applies a multiple count adjustment under U.S.S.G. § 3D1.4.

As explained in the PSR, Group 1, consisting of Counts 1-21, is properly calculated using the fraud guideline, U.S.S.G. § 2B1.1, because it results in a higher offense level than the money laundering guideline.  *See* Zubair PSR, ¶ 58.  The following chart shows the PSR's calculation of the offense level for Group 1:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, offense of conviction with maximum punishment of 20 years or more | 7 | U.S.S.G. § 2B1.1(a)(1) | Zubair PSR, ¶ 59 |
| Loss amount at least $9.5 million but less than $25 million | +20 | U.S.S.G. § 2B1.1(b)(1)(K) | Zubair PSR, ¶ 60 |
| Offense involved substantial financial hardship to one or more victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(iii) | Zubair PSR, ¶ 61 |
| Offense involved substantial part of scheme committed outside United States and sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(B) and (C) | Zubair PSR, ¶ 62 |
| Offense involved conduct described in 18 U.S.C. § 1040 | +2 | U.S.S.G. § 2B1.1(b)(12) | Zubair PSR, ¶ 63 |
| Offense involved a dangerous weapon | +2 | U.S.S.G. § 2B1.1(b)(16)(B) | Zubair PSR, ¶ 64 |
| Organizer, leader, manager, or supervisor | +2 | U.S.S.G. § 3B1.1(c) | Zubair PSR, ¶ 66 |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 | Zubair PSR, ¶ 67 |
| **Subtotal** | 39 | | Zubair PSR, ¶ 68 |

Group 2, consisting of Counts 26, 28, 30, 31, and 32, is properly calculated using the bribery guideline, U.S.S.G. § 2C1.1. *See* Zubair PSR, ¶ 70. The following chart shows the calculation of the offense level for Group 2:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, not a public official | 12 | U.S.S.G. § 2C1.1(a)(2) | Zubair PSR, ¶ 70 |
| Offense involved more than one bribe | +2 | U.S.S.G. § 2C1.1(b)(1) | Zubair PSR, ¶ 71 |
| Value of bribes offered more than $95,000 and less than $150,000 | +8 | U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E) | Zubair PSR, ¶ 72 |
| Offense involved a public official in a high-level decision making or sensitive position | +4 | U.S.S.G. § 2C1.1(b)(3) | Zubair PSR, ¶ 73 |
| Organizer, leader, manager, or supervisor | +2 | U.S.S.G. § 3B1.1(c) | Zubair PSR, ¶ 75 |
| **Subtotal** | 28 | | Zubair PSR, ¶ 77 |

5

Group 3, consisting of Counts 23 and 25, is properly calculated using the tax offense guideline, U.S.S.G. § 2T1.1.  *See* Zubair PSR, ¶ 80.  The following chart shows the calculation of the offense level for Group 3:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, tax loss greater than $1,500,000 but less than $3,500,000 | 22 | U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(I) | Zubair PSR, ¶ 80 |
| Failed to report source of income from criminal activity exceeding $10,000 | +2 | U.S.S.G. § 2T1.1(b)(1) | Zubair PSR, ¶ 81 |
| **Subtotal** | 24 | | Zubair PSR, ¶ 77 |

After calculating the offense levels for each group, Group 1 had the highest offense level of 39.  Applying the multiple count adjustment guideline at U.S.S.G. § 3D1.4, the PSR found that there was no increase in offense level due to multiple counts, resulting in a combined adjusted offense level of 39.  *See* Zubair PSR, ¶ 89.  Because Zubair Al Zubair went to trial and has shown no acceptance of responsibility, the total offense level is 39.  *See* Zubair PSR, ¶ 92.

Zubair Al Zubair has no prior criminal history, resulting in zero criminal history points, and a criminal history category of I.  *See* Zubair PSR, ¶¶ 94-97.

With an offense level of 39 and criminal history category of I, the advisory sentencing guidelines range for Zubair Al Zubair calculated in his PSR is 262-327 months.  *See* Zubair PSR, ¶ 119.

B.       **GUIDELINES CALCULATION FOR MUZZAMMIL AL ZUBAIR IN PSR**

The PSR prepared for Muzzammil Al Zubair ("Muzz. PSR") also calculates a total offense level of 39.  The convictions for wire fraud conspiracy (Count 1), substantive wire fraud (Counts 2-12, 14-15), money laundering conspiracy (Count 16), substantive money laundering (Counts 17-20), and theft of government funds (Count 21) group together for guidelines purposes pursuant to U.S.S.G. § 3D1.2(d).  *See* Muzz. PSR, ¶¶ 55-57.  The convictions for conspiracy to

commit bribery concerning programs receiving federal funds (Count 26), substantive federal program bribery (Counts 28 and 30), conspiracy to commit honest services wire fraud (Count 31), and conspiracy to commit Hobbs Act extortion (Count 32) form a second group pursuant to U.S.S.G. § 3D1.2(d).  *See* Muzz. PSR, ¶ 69.  Finally, Muzzammil Al Zubair's conviction for preparation of a false tax return (Count 24) constitutes a third offense calculation that is not part of either of the other groups.  *See* Muzz. PSR, ¶ 78.  The PSR calculates the offense levels for Group 1, Group 2, and Count 24, and then applies a multiple count adjustment under U.S.S.G. § 3D1.4.

As explained in the PSR, Group 1, consisting of Counts 1-12 and 14-21, is properly calculated using the fraud guideline, U.S.S.G. § 2B1.1, because it results in a higher offense level than the money laundering guideline.  *See* Muzz. PSR, ¶ 58.  The following chart shows the calculation of the offense level for Group 1:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
| --- | --- | --- | --- |
| Base Offense Level, offense of conviction with maximum punishment of 20 years or more | 7 | U.S.S.G. § 2B1.1(a)(1) | Muzz. PSR, ¶ 59 |
| Loss amount at least $9.5 million but less than $25 million | +20 | U.S.S.G. § 2B1.1(b)(1)(K) | Muzz. PSR, ¶ 60 |
| Offense involved substantial financial hardship to one or more victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(iii) | Muzz. PSR, ¶ 61 |
| Offense involved substantial part of scheme committed outside United States and sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(B) and (C) | Muzz. PSR, ¶ 62 |
| Offense involved conduct described in 18 U.S.C. § 1040 | +2 | U.S.S.G. § 2B1.1(b)(12) | Muzz. PSR, ¶ 63 |
| Offense involved a dangerous weapon | +2 | U.S.S.G. § 2B1.1(b)(16)(B) | Muzz. PSR, ¶ 64 |
| Organizer, leader, manager, or supervisor | +2 | U.S.S.G. § 3B1.1(c) | Muzz. PSR, ¶ 66 |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 | Muzz. PSR, ¶ 67 |
| **Subtotal** | 39 | | Muzz. PSR, ¶ 68 |

Group 2, consisting of Counts 26, 28, 30, 31, and 32, is properly calculated using the bribery guideline, U.S.S.G. § 2C1.1. *See* Muzz. PSR, ¶ 70. The following chart shows the calculation of the offense level for Group 2:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, not a public official | 12 | U.S.S.G. § 2C1.1(a)(2) | Muzz. PSR, ¶ 70 |
| Offense involved more than one bribe | +2 | U.S.S.G. § 2C1.1(b)(1) | Muzz. PSR, ¶ 71 |
| Value of bribes offered more than $95,000 and less than $150,000 | +8 | U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E) | Muzz. PSR, ¶ 72 |
| Offense involved a public official in a high-level decision making or sensitive position | +4 | U.S.S.G. § 2C1.1(b)(3) | Muzz. PSR, ¶ 73 |
| **Subtotal** | 26 | | Muzz. PSR, ¶ 77 |

Count 24 is properly calculated using the tax offense guideline, U.S.S.G. § 2T1.1. *See* Muzz. PSR, ¶ 80. The following chart shows the calculation of the offense level for Group 3:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, tax loss greater than $100,000 but less than $250,000 | 16 | U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(F) | Muzz. PSR, ¶ 78 |
| **Subtotal** | 24 | | Muzz. PSR, ¶ 83 |

After calculating the offense levels for each group, Group 1 had the highest offense level of 39. Applying the multiple count adjustment guideline at U.S.S.G. § 3D1.4, the PSR found that there was no increase in offense level due to multiple counts, resulting in a combined adjusted offense level of 39. *See* Muzz. PSR, ¶ 87. Because Muzzammil Al Zubair went to trial and has shown no acceptance of responsibility, the total offense level is 39. *See* Muzz. PSR, ¶ 89.

8

Muzzammil Al Zubair has no prior criminal history, resulting in zero criminal history points, and a criminal history category of I.  *See* Muzz. PSR, ¶¶ 92-95.

With an offense level of 39 and criminal history category of I, the advisory sentencing guidelines range for Muzzammil Al Zubair calculated in his PSR is 262-327 months.  *See* Muzz. PSR, ¶ 120.

C.       **GUIDELINES CALCULATION FOR MICHAEL SMEDLEY IN PSR**

The PSR prepared for Smedley ("Smedley PSR") provides for a total offense level of 30. The convictions for conspiracy to commit bribery concerning programs receiving federal funds (Count 26), substantive federal program bribery (Counts 27 and 29), conspiracy to commit honest services wire fraud (Count 31), and conspiracy to commit Hobbs Act extortion (Count 32) group together pursuant to U.S.S.G. § 3D1.2(d).  *See* Smedley PSR, ¶ 29.   The offense level is properly calculated using U.S.S.G. § 2C1.1.  *See* Smedley PSR, ¶ 30.  The following chart shows the calculation of the offense level:

| Description | Offense Level | Guideline Provision | PSR Paragraph |
|---|---|---|---|
| Base Offense Level, public official | 14 | U.S.S.G. § 2C1.1(a)(2) | Smedley PSR, ¶ 30 |
| Offense involved more than one bribe | +2 | U.S.S.G. § 2C1.1(b)(1) | Smedley PSR, ¶ 31 |
| Value of bribes solicited or accepted more than $250,000 and less than $550,000 | +12 | U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(G) | Smedley PSR, ¶ 32 |
| Offense involved a public official in a high-level decision making or sensitive position | +4 | U.S.S.G. § 2C1.1(b)(3) | Smedley PSR, ¶ 33 |
| Zero-point offender | -2 | U.S.S.G. § 4C1.1 | Smedley PSR, ¶ 39 |
| **Subtotal** | 30 | | Smedley PSR, ¶ 40 |

Because Smedley went to trial and has shown no acceptance of responsibility, the total offense level is 30.  *See* Smedley PSR, ¶ 40.

9

Smedley has only one prior adult conviction, resulting in zero criminal history points, and a criminal history category of I.  *See* Smedley PSR, ¶¶ 94-97.

With an offense level of 30 and criminal history category of I, the advisory sentencing guidelines range for Smedley calculated in his PSR is 97-121 months.  *See* Smedley PSR, ¶ 71.

## IV.  PSR OBJECTIONS BY THE DEFENDANTS

### A.  ZUBAIR AL ZUBAIR AND MUZZAMMIL AL ZUBAIR OBJECTIONS

Defendants Zubair Al Zubair and Muzzammil Al Zubair submitted numerous objections to their respective PSRs, although many of these objections appear to be joint objections or relate to the same provisions.  The Probation Officer fully addressed and responded to each of the objections in their respective PSRs, explaining the reasoning and basis supporting the PSR.  The government agrees with and adopts the PSR's responses to the objections with the exception of their objections to the enhancement for possessing a firearm in connection with the offense at U.S.S.G. § 2B1.1(b)(16)(B), as explained further below.

Zubair Al Zubair also addressed several of his objections in his Sentencing Memorandum (R. 302: Zubair Sent. Memo, PageID 5366-68).  Muzzammil Al Zubair stated in his Sentencing Memorandum that he was maintaining all of his previously filed objections and also made arguments related to several of them. (R. 301: Muzzammil Sent. Memo, PageID 5349-50).  With the exception of the objection to the application of U.S.S.G. § 2B1.1(b)(16)(B), the government adopts the responses of provided by the Probation Officer in response to the Defendants' objections.  In addition, the government submits the following responses to the Defendants' objections to the facts in the PSR and to the calculation of the controlling offense level pursuant to the fraud guideline at U.S.S.G. § 2B1.1.

10

1.     **Generalized Objections to the Facts**

Zubair Al Zubair and Muzzammil Al Zubair both make generalized objections to the facts described in paragraphs 5-48 of their respective PSRs.  *See* Zubair PSR, Addendum, p. 33-34; Muzz. PSR, Addendum, p. 34.  These objections are generalized and do not identify specific facts that are inaccurate and do not provide specific evidence showing that these facts are inaccurate.  This objection should be overruled, and the Court should adopt the facts in the PSRs described in paragraphs 5 through 48, which are based on and supported by the extensive evidence introduced at trial.

"A district court may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings." *United States v. House*, 872 F.3d 748, 752 (6th Cir. 2017) (citing *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994)).  This burden is more than merely denying that the facts in the PSR are untrue or inaccurate.  The Sixth Circuit approvingly quoted the Seventh Circuit's formulation of this requirement:

> [a] defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

*United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (quoting *Mustread*, 42 F.3d at 1102).  *See also United States v. Wala*, 166 F.4th 583, 601(6th Cir. 2026) (defendant's "bare denial" of fact in PSR "does not create a genuine dispute" of fact) (citing *Lang*, 333 F.3d at 681).  The defendants' objections to the facts described in the PSR are cursory denials, and as such, do not meet their burden to proffer evidence placing any of the facts in doubt.

Further, the facts described in the PSR are based on and supported by the evidence introduced at trial and the jury's verdicts.  "[I]t is well settled that 'a guilty verdict, not set aside,

11

binds the sentencing court to accept the facts necessarily implicit in the verdict.'" *United States v. Martinez*, 110 F.4th 160, 174 (2d Cir. 2024) (citing *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995)). In fact, it is "improper" for a sentencing court to "rely on facts directly inconsistent with those found by a jury beyond a reasonable doubt." *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008).

Because the defendants have not presented specific objections to the facts, have not presented evidence that calls the facts into doubt, and the facts are supported by the trial evidence and verdicts, defendants' objections should be overruled, and the Court should adopt the facts in the PSR.

### 2.      **Objections to the Offense Level Calculation**

Zubair Al Zubair and Muzzammil Al Zubair both object to almost every aspect of the calculation of the applicable sentencing guidelines offense level using the controlling fraud guideline at U.S.S.G. § 2B1.1.

#### a.) *Base Offense Level:*

Zubair Al Zubair objects to the base offense level "because the calculation is improper and/or was unproven at trial." *See* Zubair PSR, Addendum, p. 33. The base offense level is correct. U.S.S.G. § 2B1.1(a)(1) provides for a base offense level of 7 if the defendant was convicted of an offense with a statutory maximum term of imprisonment of 20 years or more. *See* U.S.S.G. § 2B1.1(a)(1). The Al Zubairs were both convicted of violations of 18 U.S.C. §§ 1343 and 1349, wire fraud and wire fraud conspiracy, which have maximum punishments of 20 years. *See* 18 U.S.C. § 1343. Therefore, the PSR correctly set their base offense levels at 7. This objection has no legal basis and should clearly be rejected.

### b.) *Loss Amount:*

Zubair Al Zubair and Muzzammil Al Zubair both object to the calculation of the loss amount.  These objections should be overruled because their PSR's correctly calculate the loss attributable to each of them at between $9,500,000 and $25,000,000.  Relevant conduct, including the loss amount, includes the following:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1).  This means that in calculating the loss, "a defendant in a jointly undertaken criminal activity is liable for all losses directly attributable to him and for all losses resulting from reasonably foreseeable acts committed by others in furtherance of the jointly undertaken criminal activity." *United States v. Pizarro-Berrios*, 448 F.3d 1, 8 (1st Cir. 2006). While Section 2B1.1 explains that that "[l]oss is the greater of actual loss or intended loss," U.S.S.G. § 2B1.1(b)(1)(A), the loss amount "may include both actual and intended losses where fraud involved both successful and ultimately unsuccessful attempts." *United States v. Mickens*, 453 F.3d 668, 671 (6th Cir. 2006) (quoting *United States v. Gross*, 84 F.App'x. 531, 533 (6th Cir.2003)).  "The government has 'the burden to prove the amount of the loss by a

13

preponderance of the evidence.'" *United States v. Wala*, 166 F.4th 583, 591 (6th Cir. 2026) (quoting *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021)).

In this case, Zubair Al Zubair and Muzzammil Al Zubair are both responsible for a loss of at least $9,500,000. They are responsible for the following losses attributable to these jointly undertaken criminal schemes:

1. **UAE Investor Scheme (Victim R.A.): Actual Loss of $737, 655**. R.A. wire-transferred a total of $860,875 to the Al Zubair Capital Account, as shown by bank records. (*See* Trial Ex. 1, JPMC X9283 Al Zubair Capital Account). It takes into account that $10,946 was wire-transferred back to R.A. and that $112,274 was invested into a TD Ameritrade account and not transferred back to the Al Zubair Capital bank account for personal use, giving the defendants the benefit of the doubt that this amount was actually invested on behalf of R.A. The remaining $737,655 was used for other non-investments purposes, including numerous personal expenses. (*See* Trial Ex. 508, R*** Investment Disbursement Chart). IRS Special Agent Drew Vargo explained the flow of this money in his testimony at trial. This was jointly undertaken activity by the defendants and the loss was foreseeable to both of them. Zubair Al Zubair communicated with R.A., but the money was transferred to the Al Zubair Capital bank account used by both defendants and Muzzammil Al Zubair controlled the TD Ameritrade account that some of the money flowed in and out of. Both also profited from the fraud, as shown in Trial Ex. 508.

2. **SBA EIDL Loan Fraud (Victim SBA)**: **Actual Loss of $27,400.** The defendants were convicted of wire fraud conspiracy, wire fraud, and theft of government funds related to obtaining $27,400 from a fraudulent SBA EIDL loan. Defendants dispute that the loan was fraudulent and that they spent the funds on legitimate business expenses. This is essentially an argument that they are innocent of the offense, which is not cognizable at sentencing. *See*

14

*United States v. Vujovic*, 635 F.App'x. 265, 273 (6th Cir. 2015) ("A defendant, however, cannot continue to present evidence of innocence at sentencing."). Implicit in the verdict of guilty was that the loan was fraudulent and the proceeds were not spent on legitimate business expenses. The Court is bound by the verdict at sentencing. *See Hunt*, 521 F.3d at 649 ("improper" for a sentencing court to "rely on facts directly inconsistent with those found by a jury beyond a reasonable doubt"). Agent Vargo's testimony, the chart he prepared showing how the loan proceeds were spent, and the bank records show that the funds were not spent on legitimate business expenses. (*See* Trial Ex. 14, PNC X2216 DBI Account; Trial Ex. 502, EIDL Loan Disbursement Chart).

The bank records also show that the SBA loan funds were not spent on a $20,000 check to Momma's Bowl as the defendants repeatedly claim. The bank records show that the loan proceeds were received on March 9, 2021, and that every penny of the loan proceeds had been spent by March 31, 2021, leaving the account with a negative balance. Then on April 13, 2021, the defendants deposited $100,000 in funds they obtained from R.A. into the same account. Only after spending all of the SBA funds and depositing the $100,000 in funds received from R.A., was the check for $20,000 written to Momma's Bowl on April 21, 2021. (*See* Trial Ex. 14, PNC X2216 DBI Account). This shows that the SBA funds were not used to invest in Momma's Bowl. Finally, this amount was also the result of a jointly undertaken scheme. The text messages introduced at trial between Zubair Al Zubair and Muzzammil Al Zubair shows that they actively discussed obtaining the loan from the SBA.

3. **Nela Park Cryptocurrency Mining Fraud (Victim Y.L.): Actual Loss of $3,000,000.** Zubair Al Zubair and Muzzammil Al Zubair fraudulently obtained $3,000,000 from Y.L. to support setting up a cryptocurrency mining project at Nela Park in East Cleveland. These funds were provided pursuant to an agreement signed on August 11, 2021, between Y.L.

15

and her business and Zubair Al Zubair and Dubai Bridge Investments.  The agreement contained material falsehoods and was the result of multiple lies told by the defendants to induce Y.L. into providing the funds, which were then spent by defendants on everything but Nela Park.  Special Agent Vargo's testimony and the chart he prepared show how these funds were spent. (*See* Trial Ex. 504, Nela Park Investments Disbursement Charts).

Defendants continue to make the argument that they are not responsible for this loss because they claim the funds did not actually belong to Y.L.  First, their argument is clearly foreclosed by the jury's verdict.  Defendants made this same argument at trial.  Implicit in the jury's guilty verdict is a rejection of this argument.  Second, Y.L. testified at trial that the $3,000,000 was her money.  Third, the text message communications showed that Y.L. used a third party to make the payments because her company did not yet have a U.S. bank account and that Muzzammil Al Zubair was aware of that.  (*See* Trial Ex. 460, p. 25).   This was also the result of jointly undertaken activity as both defendants were involved in the preparation of the agreement, the discussions with Y.L. about Nela Park, and shared in spending the proceeds.

4.      **Nela Park Cryptocurrency Mining Scheme Expenses Incurred (Victim Y.L.): Actual Loss of at least $2,744,687.32.**  Relying on the defendants' false promises that they owned or controlled Nela Park, including the agreement signed on August 11, 2021, Y.L. arranged for the shipment of Antbox cryptocurrency mining containers from China to the United States to be delivered to Nela Park.  However, the defendants did not own or control Nela Park. Y.L. incurred significant expenses in shipping and storing the containers and other mining equipment due to her reliance on the defendants' false promises.  This included paying approximately $2,744,687.32 in customs duties for importing a total of 276 containers in two shipments (one of 136 and the other of 140 containers).  (*See* Trial Ex. 167, Customs Forms (136 container shipment)).  Additional shipping and storage fees were also incurred.

16

5.      **Theft and Sale of Cryptocurrency Mining Containers (Victim Y.L.): Actual**

**Loss of $520,000.**  Without authorization, the defendants stole 13 Antbox cryptocurrency mining

containers that Y.L. placed in storage for approximately $520,000 total.  Y.L. testified that she

did not provide authorization to sell the Antbox containers and that she found 13 of the Antbox

containers were missing from her inventory.  She informed Zubair Al Zubair of this in a text

message to him.  (*See* Trial Ex. 179, p. 241).  Mike Lin testified that he traveled to the Cleveland

area to inspect Antbox containers on behalf of Lion Technology.  He also testified that Lion

Technology made an initial purchase of three containers for $40,000 each, with payment by wire

transfer.  Bank records show this initial payment of $120,000.  (*See* Trial Ex. 1, P. 115, 127).

Lin then testified that Lion Technology purchased additional containers but payments were by

cryptocurrency.  In a text message exchange between Zubair Al Zubair and Muzzammil AL

Zubair they discussed "Mike" wanting 10 more containers at a price of $40,000 per container.

(*See* Trial Ex. 471, P. 220-226).  An initial purchase of three followed by an additional purchase

of 10 more is consistent with Y.L. finding that 13 containers were missing from her inventory.

The text messages between the defendants discussing the purchase also show that this was jointly

undertaken criminal activity.

6.      **Theft and Sale of Cryptocurrency Mining Machines (Victim Y.L.): Actual**

**Loss of $5,374,760.**  The defendants stole and sold without authorization over 1000

cryptocurrency mining machines belonging to Y.L.  Y.L. testified that she did not give

permission to sell the mining machines.  Taras Kulyk testified he purchased the machines from

Dubai Bridge Investments.  The sales contracts and bank records show that the defendants

received $6,174,760 for the mining machines from Kulyk's company.  (*See* Trial Ex. 3, JPMC

X0302 DBI Account, p. 31; Trial Ex. 188, May 3, 2022 Sales Agreement; Trial Ex. 189, May 18,

2022 Sales Agreement).  The text messages between the defendants show that this was part of a

joint scheme between them.  The testimony of Special Agent Vargo and the chart he prepared showing the flow of money also show that the defendants both profited from the scheme.  (*See* Trial Ex. 506, Proceeds from Crypto Mining Equipment Expenditures Chart).  Although they received $6,174,760 from the sale of the mining machines, the defendants did send Y.L. $800,000 from the proceeds, which reduces the actual loss to $5,374, 760.

7. **Fraudulent Inducement to Transfer Funds (Victim Y.L.): Actual Loss of $160,000.**  Y.L. was fraudulently induced to transfer $160,000 to Zubair Al Zubair's account based on his promise that it was necessary to establish a transaction history to allow him to later transfer millions of dollars in investment funds he promised would be provided by his family to Y.L.  The investment funds were never provided.  This inducement was made as part of the larger joint fraud scheme by the defendants to convince Y.L. to allow them to gain access to her mining machines so that they could sell them and keep the profits.  Y.L.'s testimony and the text messages from Zubair Al Zubair to Y.L. show the fraudulent inducement and bank records corroborate the transfer of the funds.  (*See* Trial Ex. 179, L**-Zubair WhatsApp Chat; Trial Ex. 5, JPMC X9636 Zubair Account).

8. **Fraudulently Obtained Residential Lease (Victim N.Z.): Actual Loss of $553,504.**  N.Z. suffered substantial losses in the form of damage to the residence that he leased to Zubair Al Zubair.  N.Z. was fraudulently induced to lease the residence to Zubair Al Zubair through a falsified account statement that showed Zubair Al Zubair with access to significantly greater funds than he actually had.  The evidence at trial showed that Muzzammil Al Zubair was involved in the creation of the false account statement.  But for this falsified statement, N.Z. would not have leased the residence to Zubair Al Zubair, and he would not have incurred the damage to his home.  The amount of damage is supported by the victim impact records provided as an attachment to the Zubair PSR and Muzzammil PSR. (*See* N.Z. Victim Impact Statement,

18

To Be Filed Separately Under Seal).  The amount of loss reported by N.Z. was $560,854, but this loss is reduced by the $7,350 in damages caused by the FBI when executing a search warrant.

9.      **U.A.E. Investor Scheme (Victim R.A.): Intended Loss of $3,550,000.**  As part of the scheme to fraudulently obtain funds from R.A., Zubair Al Zubair solicited up to $4,000,000 in an email he sent to R.A. on April 1, 2021, for an investment in an oil field while promising an outrageously high return on that investment.  (*See* Trial Ex. 224, Email-2021-04-01).  Shortly after this email, R.A. sent $450,000 by wire transfer to Al Zubair Capital.  Although the email sought $4,000,000, the intended loss is reduced by the lesser amount that R.A. actually sent, which is incorporated into the actual loss by R.A. described above.  As explained above, the scheme to fraudulently obtain investment funds from R.A. was a joint endeavor involving both defendants.

10.      **Fraudulent Attempt to Obtain Commercial Lease (Victim First Interstate Properties): Intended Loss of $254,100.**  Zubair Al Zubair and Muzzammil Al Zubair attempted to obtain a lease for a commercial space from First Interstate Properties, owners of the building at One University Circle in Cleveland.  As part of the scheme, Muzzammil Al Zubair falsified a TD Ameritrade account statement to attempt to show that they had more funds than they actually did when required to provide financial information as a condition of obtaining a lease.  During the negotiations, the draft letter of intent included provisions requiring First Interstate Properties to pay $40,000 for an HVAC system, $15,000 for a sprinkler system, and $199,100 for a Tenant Improvement Allowance, for a total of at least $254,100.  (*See* Trial Ex. 268, Email-2022-02-08).

This results in a total actual and intended loss of at least 16,922,106.32.  While this calculation is slightly different than the calculation in their PSR's, it is still well within the loss range of $9,500,000 to $25,000,000 calculated in the PSR's.  This loss is not speculative and

does not require resort to estimating or a complicated methodology.  It is based on the facts showing the amounts that the defendants obtained or sought to obtain through their many schemes.  The defendants' objections to the loss amount should be overruled.

### c.)  *Substantial Financial Hardship:*

Zubair Al Zubair and Muzzammil Al Zubair object to the application of the substantial financial hardship enhancement at U.S.S.G. § 2B1.1(b)(2)(A)(iii).  This objection should be overruled, as the enhancement is supported by the facts of this case.  As shown above, Y.L. incurred losses and expenses of at least $11,799,447.32 as a result of the joint fraud perpetrated by the defendants.  In addition to these losses, due to the fraud the entire cryptocurrency mining operation intended for Nela Park never occurred, causing further lost profits and opportunities to Y.L. and her business.  Ultimately, Y.L. was forced to move because the reason for her living in Cleveland disappeared with the collapse of the project due to the defendants' fraudulent actions.  As she explains in her victim impact statement, the defendants' fraud effectively put her company out of business as she lost customers, investors, and opportunities along with the financial losses. (*See* Y.L. Victim Impact Statement, To Be File Separately Under Seal).

Losses on the scale incurred by Y.L. and her business as they were attempting to start up operations were not minimal or trivial and amounted to substantial financial hardship, as illustrated by Y.L.'s explanation in her victim impact statement of the effects on her company. *See United States v. Vance*, Nos. 23-5766/5773, 2024 WL 4867049, at *5 (6th Cir. Nov. 22, 2024) (unpublished) (explaining that for substantial financial hardship enhancement to apply, "Gauged by the victim's specific financial circumstances, the loss must be 'more than minimal or trivial.'") (quoting *United States v. Skouteris*, 51 F.4th 658, 672 (6th Cir. 2022)); *United States v. Aderinoye,* 33 F.4th 751, 757 (5th Cir. 2022) ("We have never defined substantial hardship but agree with other circuits that a loss qualifies if it significantly impacts the victim's

resources."  Substantial financial hardship existed for business where "loss was not ruinous" and "the company continued to operate after the fraud," but loss was "not minor or inconsequential either.").

### d.) Sophisticated Means:

Both Zubair Al Zubair and Muzzammil Al Zubair object to the application of the sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  This objection should be rejected because the enhancement is properly applied.  Application Note 9(B) to U.S.S.G. § 2B1.1 defines what is meant by "sophisticated means:"

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, Commentary, n. 9(B).

In this case the wire fraud conspiracy involved conduct that supports application of the sophisticated means enhancement in several ways.  First, the defendants utilized altered bank and TD Ameritrade account statements in furtherance of the conspiracy.  Courts have found that use of altered or forged documents in furtherance of a fraud scheme qualifies for the sophisticated means enhancement.  *See United States v. Vance*, Nos. 23-5766/5773, 2024 WL 4867049, at *5 (6th Cir. Nov. 22, 2024) (unpublished) ("Use of false documents and artificial corporate entities to further the fraudulent scheme—the essence of the fraud at issue here—'typically justifies the sophisticated means enhancement.'") (citing *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018)); *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) (affirming application of sophisticated means enhancement where defendant submitted "numerous loan applications to

21

lenders containing forged signatures, forged notary stamps, and falsified or altered tax returns, pay stubs, gift letters, bank statements, and bank notes"). A case out of the Seventh Circuit is particularly instructive as the defendant's conduct in that case included the "doctoring of another person's tax forms to support a lease application for a home paid for with the victim's money" which the court found "obviously goes above and beyond the activity inherent in wire fraud." *United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021). Similarly, in this case, the defendants submitted altered account statements in support of the applications for residential and commercial leases described in the Indictment.

Second, the conspiracy was global in scope. The conspiracy involved obtaining investment funds from a victim in the U.A.E., wire transfers from China as part of the Nela Park scheme, the shipment of mining containers from China, and the sale of stolen mining machines to a company based in Canada. The international scope of the conspiracy supports the enhancement. *See United States v. Yousef*, __ F.4th __, 2026 WL 746912, at * 7 (6th Cir. 2026) (upholding application of sophisticated means enhancement where defendant "operated on a global scale"). This is consistent with Application Note 9(b), which specifically refers to use of multiple jurisdictions as an example of sophisticated means.

Third, when considering the application of the sophisticated means enhancement, the entire scope of the wire fraud conspiracy should be considered. *See United States v. Masters*, 216 F.App'x. 524, 526 (6th Cir. 2007) (affirming application of sophisticated means enhancement based on the totality of the scheme). While not all of the parts of the conspiracy may have been complex themselves, the overall conspiracy showed a high degree of complexity, as it included use of altered documents, foreign financial transactions, shipments of goods from overseas, sale of stolen goods to a foreign customer, use of multiple bank accounts and shuttling of funds back and forth between accounts, and deception to obtain access to mining equipment.

The overall effect of the entire conspiracy was a complex web of schemes, sufficient to qualify for the enhancement.  *See United States v. Finley,* 600 F.App'x. 964, 967 (6th Cir. 2015) ("Perhaps no individual step of Finley's conspiracy is sophisticated, but a scheme may be sophisticated even when none of its component parts standing alone is complex or intricate."); *United States v. Thomas*, 841 F.App'x. 934, 938 (6th Cir. 2021) ("Even if the conduct does not appear to be particularly intricate on its face, the enhancement may still apply.").  As a result, the objection to the sophisticated means enhancement should be rejected.

### e.)  Offense Involved Conduct Described in 18 U.S.C. § 1040:

Zubair Al Zubair and Muzzammil Al Zubair object to the application of the specific offense characteristic at U.S.S.G. § 2B1.1(b)(12) for an offense involving conduct described at 18 U.S.C. § 1040, which relates to fraud in connection with major disaster or emergency benefits.  See 18 U.S.C. § 1040.  This enhancement relates to the defendants' theft of $27,400 in SBA EIDL funds.  The basis of the defendants' objections is their continuing claim that they spent the funds for legitimate business purposes.  However, implicit in the jury guilty verdict is a rejection of this argument.  Continuing to claim innocence in the face of a jury verdict to the contrary is not a basis for objecting to a guidelines enhancement.  *See Vujovic*, 635 F.App'x. at 273 ("A defendant, however, cannot continue to present evidence of innocence at sentencing.").

### f.)  Offense Involved a Dangerous Weapon:

Zubair Al Zubair and Muzzammil Al Zubair object to the application of the specific offense characteristic of possession of a dangerous weapon in connection with the offense pursuant to U.S.S.G. § 2B1.1(b)(16)(B).  The government does not oppose this objection.

### g.)  Organizer, Leader, Manager, or Supervisor:

Zubair Al Zubair and Muzzammil Al Zubair object to application of the leadership enhancement pursuant to U.S.S.G. § 3B1.1(c) to each of them.   The evidence supports

23

application of a two-level aggravating role increase for Zubair Al Zubair and Muzzammil Al Zubair as it relates to the fraud conspiracy pursuant to U.S.S.G. § 3B1.1(c).  In order for the enhancement to apply, "the defendant must have exerted control over at least one other participant in the criminal scheme;" however, the enhancement does not apply "where the defendant has 'merely exercised control over the property, assets or activities of the enterprise.'" *United States v. Turner*, 738 F.App'x. 856, 861 (6th Cir. 2018) (citations omitted).

Zubair Al Zubair qualifies for the enhancement.  First, Zubair Al Zubair was in a position of leadership in the entities involved in the criminal conspiracy.  In the SBA EIDL Loan application, Zubair Al Zubair was listed as a 51% owner of Dubai Bridge Investments. (*See* Trial Ex. 42, SBA EIDL Application).  The Dubai Bridge Investments website listed Zubair Al Zubair as Chairman.  (*See* Trial Ex. 48, Dubai Bridge Investments Website).  Zubair Al Zubair's application for a commercial lease at One University Circle listed him as chairman of Al Zubair Capital and Dubai Bridge Investments.  (*See* Trial Ex. 98, OUC Commercial Lease Application). These entities were integral to the wire fraud conspiracy.

Zubair Al Zubair was more than just the leader of the entities involved.  The evidence shows he directed at least one other person by directing the activities of his brother, Muzzammil Al Zubair.  For example, Zubair Al Zubair directed Muzzammil Al Zubair on what to say to Y.L. related to providing power to the Nela Park project.  (*See* Trial Ex. 471, , p. 72).  Muzzammil Al Zubair then sent that exact statement to Y.L. in a group chat.  (*See* Trial Ex. 465, E, p. 7).  As another example, Zubair AL Zubair directed Muzzammil Al Zubair on obtaining the key from Y.L. to the storage unit where she stored cryptocurrency mining machines.  (*See* Trial Ex. 471, p. 201-203).  These examples show that Zubair exerted control over at least one other person.

Muzzammil Al Zubair also qualifies for the leadership enhancement.  He too played a significant leadership role in the relevant entities.  In the SBA EIDL Loan application,

24

Muzzammil was listed as a 49% owner of Dubai Bridge Investments.  (*See* Trial Ex. 42, SBA EIDL Application).  The Dubai Bridge Investments website listed Zubair as Chairman and Muzzammil as Managing Partner.  (*See* Trial Ex. 48, Dubai Bridge Investments Website).

In addition to the leadership positions at their businesses, Muzzammil then exercised a leadership or supervisory role over others as well.  For example, during the theft of Lyu's machines, Muzzammil directed others in a task integral to the criminal conduct.  Surveillance videos admitted at trial show Muzzammil directing the crew that took Y.L.'s cryptocurrency mining machines from several storage units where Y.L. had stored them.  (*See* Trial Exs. 192-197, 199-200, 203-204, and 206-207).

### h.)  Obstruction of Justice:

Zubair Al Zubair and Muzzammil Al Zubair also object to an enhancement for Obstruction of Justice pursuant to U.S.S.G. § 3C1.1.  This objection should be overruled because they filed a lawsuit against potential government witnesses while the case was still pending prior to trial as a means to intimidate those witnesses.  They filed a civil lawsuit against government witness Dyann Davison, her employer Howard Hanna, and one of the case agents, FBI Special Agent Michael Mitchell.  The lawsuit was based on Davison's alleged breach of a non-disclosure agreement by providing information to SA Mitchell that he received as part of the investigation.  The lawsuit requested compensatory damages of $3,000,000 and punitive damages of $7,000,000.  Zubair and Muzzammil also filed a motion for a temporary restraining order against SA Mitchell that would have affected his ability to conduct interviews in preparation for trial.  The lawsuit was described and attached as an exhibit to the government's Motion to Modify Conditions of Release (R. 88) and Motion for Protective Order Regulating Discovery Pursuant to Fed. R. Crim. P. 16(d) (R. 89).

25

This lawsuit was directly related to the investigation of this case.  The natural effect of this lawsuit was to intimidate Davison prior to her expected testimony at trial in this case. Application Note 4(A) explains that the obstruction of justice enhancement applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1, Commentary, n. 4(A).  The timing of this lawsuit is key.  The Sixth Circuit has held that efforts to purely retaliate against a witness after a case has concluded do not qualify for the obstruction of justice enhancement because they cannot intimidate or influence testimony after a trial is complete.  See Turner, 738 F.App'x. at 862 (finding that enhancement did not apply because the defendant "ensured that the informant would not be harmed—and would not learn of the plot against him—until after Turner's sentencing, at which point the plot could not possibly have affected the criminal proceeding").  Crucially, however, in contrast to the *Turner* case, here, the defendants' lawsuit against Davison and Special Agent Mitchell was filed prior to trial, when the defendants had reason to believe that both would be witnesses against them.  *See United States v. Heard*, No. 24-1778, 2025 WL 3244490, at *5 (6th Cir. Nov. 20, 2025) (upholding application of enhancement and distinguishing *Turner* where defendant made threatening Facebook post about witness prior to witness's expected testimony).  The natural effect of filing a lawsuit seeking millions of dollars in damages against witnesses before they testify is to intimidate those witnesses and possibly influence their testimony.  This effect is even greater when the lawsuit also names a witness's employer, threatening the witness's livelihood.  *See also United States v. Door*, 996 F.3d 606, 622 (9th Cir. 2021) (finding that "pre-trial threats could reasonably be construed as an attempt to obstruct justice on the theory that Door wanted to prevent the agent from testifying at his trial").

26

Further, the filing of the lawsuit was also conduct that was "prohibited by obstruction of justice provisions under title 18, United States Code."  *See* U.S.S.G. § 3C1.1, Commentary, n. 4(I).  Specifically, filing a lawsuit to harass, intimidate, or retaliate against a witness violates 18 U.S.C. § 1513(e), which provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1513(e).  *See also United States v. Camick*, 796 F.3d 1206, 1219-23 (10th Cir. 2015) (affirming conviction for violation of 18 U.S.C. § 1513(e) based on filing of civil rights lawsuit against witness).

Defendants' claims that they were unaware that Davison or Special Agent Mitchell could be witnesses defies reality.  The residential and commercial lease schemes alleged in the Superseding Indictment directly involved Davison, as she was the realtor who represented them in those transactions.  She was the one they provided with falsified account statements to use in support of the lease applications.  It is apparent from any reading of the charges in the Superseding Indictment that she would be a relevant witness at trial.  Although referred to as Realtor 1 in the charging document, there was no other realtor involved in the case who could plausibly be Realtor 1 other than Davison.  Similarly, it was also apparent that Special Agent Mitchell as one of the lead investigators was a potential witness.  The defendants objections should be overruled.

B.    **<u>SMEDLEY OBJECTIONS</u>**

Defendant Smedley did not submit any objections to the PSR prepared by the United States Probation Office.  *See* Smedley PSR, Addendum, p. 22

## V.      FINAL GUIDELINES CALCULATION

Because the government does not oppose Zubair Al Zubair and Muzzammil Al Zubair's objections to the application of the two-level increase for an offense involving possession of a firearm, the government submits that their offense levels should be reduced from 39 to 37.   The government suggests no changes to Smedley's offense level as he has not objected to any provisions in the PSR.  This results in the following advisory guidelines calculations, which the government submits are the correct calculations:

| Defendant | Offense Level | Criminal History Category | Advisory Guidelines Range |
|---|---|---|---|
| Zubair Al Zubair | 37 | I | 210-262 months |
| Muzzammil Al Zubair | 37 | I | 210-262 months |
| Michael Smedley | 30 | I | 97-121 months |

## VI.     CONSIDERATION OF SENTENCING FACTORS  UNDER 18 U.S.C. § 3553(A) AND RECOMMENDED SENTENCES

Upon properly calculating the advisory guideline range, this Court is required to follow 18 U.S.C. § 3553(a), which provides:

> This Court is required to consider the following factors in determining the sentence.
>
> (a)  Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
>> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>>
>> (2)  the need for the sentence imposed--
>>
>>> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>>
>>> (B)  to afford adequate deterrence to criminal conduct;

28

(C)  to protect the public from further crimes of the
defendant; and

(D) to provide the defendant with needed educational or
vocational training, medical care, or other correctional
treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established
for--

(5)  any pertinent policy statement--

(6)  the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct; and

(7)  the need to provide restitution to any victims of the
offense.

18 U.S.C. § 3553(a).  While the Court is required to consider all of these factors, the following

factors are the most relevant to fashioning the appropriate sentence in this case.

A.  **Zubair Al Zubair and Muzzammil Al Zubair**

After consideration of all of the Section 3553(a) factors, the government recommends

that the Court impose a sentence within the advisory guidelines range of 210-262 months for

both Zubair Al Zubair and Muzzammil Al Zubair.  These sentences are appropriate due to the

wreckage that they have left in their wake in their pursuit of wealth to fund their lavish lifestyle.

They have shown no remorse, taken no responsibility for their actions, and have not exhibited

any regard for their victims.  They have caused real harm and due to their refusal to acknowledge

any wrongdoing, pose a real danger of causing similar harm in the future.

First, and foremost, the Court should consider the nature and circumstances of their

offenses.  Zubair Al Zubair and Muzzammil Al Zubair used a web of lies and false claims to

convince victims to provide them with money.  They then showed no hesitation to spend the

money for their own benefit.  They used lies and falsehoods to obtain money; spent the money;

29

made excuses when questioned; and blamed the victim when challenged. The text messages and emails between themselves and with victims showed how little they thought of the people they defrauded, with the condescending and belittling way they treated them. They stole millions of dollars that harmed real victims, as expressed in the victim impact statements submitted by N.Z. and Y.L.

Their betrayal harmed not only individual victims, but their own community. When Y.L. was willing to invest in a project in East Cleveland, they took that as an opportunity to defraud her, instead of supporting much-needed investment in their community. Similarly, they put their own needs ahead of their community by engaging in a pattern of bribing Smedley, co-opting a public office to act on their behalf, not the public's. As Zubair Al Zubair put it in a text to his brother, they sought to make Smedley's purpose be "to strengthen our family" so that they could "Make EC ours," paying Smedley to put their interests and concerns before the community that he was supposed to serve.

They used a web of falsehoods, falsified documents, and financial transactions to commit their offenses, showing advance planning and thought. These were not spur of the moment crimes of opportunity, but instead were the result of extensive planning and preparation, while at the same time showing a willingness to make any false claim necessary to complete the fraud, no matter how outrageous.

Second, the Court should consider the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense. This factor asks the court to consider "the 'just desserts' concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly." *United States v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010). Further, "Because the punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer

30

the sentence should be.  The seriousness of a crime varies directly with the harm it causes or threatens." *Id.*  Here the scale of the defendants' crimes requires a significant sentence.  The Court should consider the amount of money they stole, the manner in which they took it, their lack of remorse, and the harm they caused to victims.  "Just desserts" in this case is a lengthy sentence.

Third, the Court should consider the need for deterrence.  In this context, "deterrence has both an individualized and more general component."  *United States v. Robinson*, 669 F.3d 767, 777 (6th Cir. 2012).  Deterrence is also closely related to reflecting the seriousness of the offense.  "[W]here a district court fails to impose a sentence that adequately reflects the seriousness of the offense, that court has almost always also failed to afford adequate deterrence to criminal conduct."  *United States v. Rothwell*, 847 F. Supp. 2d 1048, 1069 (E.D. Tenn. 2012).

Here a lengthy sentence is necessary to afford both general and specific deterrence.  Generally, the public needs to know just how serious the consequences can be for those who commit fraud, money laundering, and public corruption offenses.  Those in the public who might be tempted by opportunities to steal, embezzle, or defraud to obtain the trappings of wealth need to know that there are serious consequences for those who commit these kinds of crimes.  Individually, it is clear from their conduct in this case that the defendants do not fully appreciate the wrongfulness of their actions, even in the face of the seriousness of the charges against them and the overwhelming evidence of their guilt presented at trial.  As a result, the only way to deter them from future crimes is to impose a sentence that fully impresses upon them the wrongfulness of their actions and the consequences should they commit similar crimes in the future.

Finally, the Court needs to protect the public from further crimes of the defendant.  Among the most fundamental of a sentencing court's duties is to protect the public. *See United States v. Trompeter*, 510 F.Supp.3d 526, 529 (N.D. Oh. 2020).  The defendants' refusal to accept

31

any responsibility for their actions or recognize the harms they caused makes it all the more likely that they will attempt to commit further crimes in the future.  Although they have not committed physical violence, they have committed real harm against their victims and their community.  The only way to ensure that they are unable to harm others is through a lengthy prison sentence.

In summary, these defendants have earned the lengthy sentence called for by the advisory sentencing guidelines range.  While the range may be high, under the facts of this case, in light of the defendants' conduct and the harm they caused, it is appropriate and reasonable.  Although the range may be higher than the average sentence in fraud cases, Zubair Al Zubair and Muzzammil Al Zubair have shown that they are not your average fraud defendants.  Therefore, the Court should sentence each of them within the advisory guidelines range of 210 to 262 months.

C.      **Michael Smedley**

After consideration of all of the Section 3553(a) factors, the government recommends that the Court impose a sentence at the low end of the advisory guidelines range of 97 months imprisonment on Smedley.

First, the Court should consider the nature and circumstances of Smedley's offenses. Smedley was the long-time Chief of Staff for the City of East Cleveland.  He was an experienced public official who knew what his responsibilities to the public trust were.  He even referenced the ethics commission during his text conversations with Zubair Al Zubair.  In short, Smedley knew better.

Despite this, Smedley showed he was willing to sell out his community for his own personal gain.  He engaged in a corrupt relationship with the Al Zubair brothers to help himself at the expense of the public.  He provided and sought to obtain official actions to benefit them,

32

when his duty should have been to the citizens of his community. In exchange he received benefits such as suite tickets to the Browns and expensive meals and solicited high-paying jobs from the Al Zubairs. Although many of the bribes were relatively small, integrity has no price limit. Further, as described in his PSR, the bribes Smedley sought were not trivial, as he solicited a job paying over $250,000 from the Al Zubairs at the same time he was seeking official action on their behalf. The extent of how much he was beholden to them is shown by his efforts to get Zubair Al Zubair appointed to a position that did not exist, complete with business cards that Zubair Al Zubair could use to advance his own interests. From trying to obtain them funding from Jobs Ohio, to pressuring Phoenix Investors to sell Nela Park to them, to having the Chief of Police check into a police report against them in Euclid, to sending letters at their behest, Smedley showed that he became a servant of the Al Zubairs instead of a servant of the public like he was supposed to be.

It is also important to recognize that while Smedley might not have been privy to the details of the Al Zubairs' fraud, he enabled it. They used their connection with him and the trappings of being connected at City Hall as a prop to help induce Y.L. to invest her money with them. Their relationship with Smedley helped them commit their fraud. While Smedley might not have actively participated in the fraud, by engaging in bribery with them, he became a part of their schemes that they used to their advantage.

Next the Court should consider the seriousness of the offense, the need to promote respect for the law, and to provide just punishment for the offense. At their core, public corruption offenses are an expression of disrespect for the law and its institutions. Public officials must be held to a high standard as they exercise responsibilities and power over their community and its citizens. A significant sentence is the only way to promote respect for the law after a public official such as Smedley has so violated the public trust. The public needs to know

33

that public officials will be held to a high standard and punished when they betray the public by putting their own interests first.

The Court should also consider the need for deterrence, especially concerning the conduct of public officials.  Public officials frequently encounter situations where their integrity is tested or where temptation arises to take advantage of a situation to their own benefit at the expense of the public trust.  A significant sentence is needed to deter others who may be in similar positions as Smedley.  Public corruption can only be deterred if public officials know with certainty that they will be subject to serious consequences if they give into temptation and betray their duty to serve the public interest.

In summary, as a public official, Smedley betrayed the trust of his community.  His duty should have been to the citizens of East Cleveland.  Instead, he put his own interests and the interests of the Al Zubairs first.  As a result, a significant sentence of 97 months is appropriate.

## VII.    **RESTITUTION**

The government requests that the Court enter an order of restitution for the amounts described in their PSR's as to Zubair Al Zubair and Muzzammil Al Zubair.

## VIII.  CONCLUSION

For the reasons described above, the government respectfully requests that the Court sentence Defendants Zubair Al Zubair and Muzzammil Al Zubair within the advisory sentencing guidelines range of 210 to 262 months and sentence Michael Smedley to 97 months, which is the low end of his advisory guidelines range.

Respectfully submitted,

David M. Toepfer
United States Attorney

By:     /s/ Matthew W. Shepherd
        Matthew W. Shepherd (OH: 0074056)
        Joseph H. Walsh (OH: 0095822)
        Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3873
        (216) 522-8355 (facsimile)
        Matthew.Shepherd@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April 2026, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail at the addresses listed below.  Parties may access this filing through the Court's system.

Zubair Mehmet Abdur Razzaq Al Zubair
0076187
Mahoning County Jail
110 Fifth Avenue
Youngstown, OH 44503

Muzzammil Muhammad Al Zubair
0076188
Mahoning County Jail
110 Fifth Avenue
Youngstown, OH 44503

/s/ *Matthew W. Shepherd*
Matthew W. Shepherd
Assistant U.S. Attorney

36